ASHLEE N. LIN (SBN 275267)
alin@eisnerlaw.com
BENJAMIN KASSIS (SBN 298844)
bkassis@eisnerlaw.com
EISNER, LLP
433 N. Camden Dr., 4th Floor
Beverly Hills, California 90210
Telephone: (310) 855-3200
Facsimile: (310) 855-3201

Attorneys for Plaintiff
Martyn Atkins

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTYN ATKINS, an individual,<br><br>    Plaintiff,<br><br>    vs.<br><br>WMG PRODUCTIONS LLC, a Delaware limited liability company; GIRL ON LSD LLC, a South Carolina limited liability company; and DOES 1-10, inclusive,<br><br>    Defendants. | Case No.<br><br>**COMPLAINT FOR**<br><br>1. **PRIMARY COPYRIGHT INFRINGEMENT**<br><br>2. **CONTRIBUTORY COPYRIGHT INFRINGEMENT**<br><br>3. **CONVERSION**<br><br>**DEMAND FOR TRIAL BY JURY** |

EISNER, LLP

2868894

1
COMPLAINT

Plaintiff Martyn Atkins ("Atkins" or "Plaintiff"), for his complaint against Defendants WMG Productions, LLC ("WMG"); Girl on LSD, LLC ("GOL"); and DOES 1 through 10, inclusive (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1. Plaintiff Martyn Atkins is a highly regarded longtime professional filmmaker and artist. In 1994, Atkins was hired as the art director to create the album art for Tom Petty's solo album that would become *Wildflowers*. Petty and Atkins became fast friends, and Atkins ended up spending many hours with Petty in and out of the studio during the making of the album and the tour that came after.

2. Atkins often brought a camera and a roll of 16mm film. Ultimately, Atkins, on his own volition and at his own cost, filmed and directed hours of footage of Petty, supporting musicians, the album's producers, sound engineers, and others. For safekeeping, Atkins ended up storing his original film and audio elements in storage facilities maintained by Warner Records, Petty's record label, in Los Angeles, though he later made digital copies of much of the footage. Over the years, Atkins and Petty – who worked together on subsequent projects – would often discuss that someday Atkins would make a documentary using his material from the *Wildflowers* days; Petty loved the vision Atkins described for the film. Sadly, due to the untimely passing of Petty in 2017, the project never materialized.

3. In 2020, Atkins was asked to a meeting with Petty estate managers and Petty's daughter, Adria Petty. He was told in the meeting the estate was considering having a documentary about *Wildflowers* made and that, if it was to be, Atkins would of course produce and direct the project. Indeed it was acknowledged at all times that the original documentary idea was always Atkins's. During the business discussion, the location of the original materials came up. Atkins, having inventoried everything years earlier, did not hesitate to share with Adria Petty and the Petty estate managers where the materials were located. Atkins was never asked to another meeting.

4. In November 2021, a feature length documentary called "Somewhere You Feel Free" was released (the "Film"). Of the 90 minute Film, which itself refers to Atkins as the "filmographer," a shocking 45 minutes is comprised of the footage Atkins shot in the mid-1990s and of which Atkins is the exclusive owner and author. The Film's producers did not seek or obtain consent from Atkins to use his copyrighted footage. Atkins did not provide consent, did not otherwise license any of the footage, and was not compensated in any manner for the Film's unauthorized, brazen exploitation of the works Atkins created and owns.

## THE PARTIES

5. Plaintiff Martyn Atkins is, and at all relevant times mentioned herein was, an individual residing in the State of California, County of Los Angeles.

6. Defendant WMG Productions LLC ("WMG") is, and at all relevant times mentioned herein was, a limited liability company organized and existing under the laws of the State of Delaware. WMG is identified in the credits of the Film as the putative author of the Film for purpose of U.S. Copyright Law. Upon information and belief, WMG is wholly-owned by Warner Records Inc. or Warner Music Group Corp.

7. Defendant Girl on LSD LLC ("GOL") is, and at all relevant times mentioned herein was, a limited liability company organized and existing under the laws of the State of South Carolina. Upon information and belief, GOL is the current putative rights holder/licensee of the Film and the producer of the Film.

8. Plaintiff is informed and believes, and on that basis alleges, that Defendants DOES 1 through 10, inclusive, are individually and/or jointly liable to Plaintiff for the conduct alleged herein. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10, inclusive, are unknown to Plaintiff at this time. Accordingly, Plaintiff sues Defendants DOES 1 through 10, inclusive, by fictitious names and will amend this Complaint to allege their true names and capacities once ascertained.

9. Plaintiff is informed and believes, and on that basis alleges, that, at all relevant times mentioned herein, Defendants, and each of them, were acting in concert or participation with each other, or were joint participants and collaborators in the acts complained of, and were the agents or employees of the others in doing the acts complained of herein, each and all acting within the course and scope of the agency of and/or employment by the others, each and all acting in concert one with the other and all together.

10. Plaintiff is informed and believes, and on that basis alleges, that, at all relevant times mentioned herein, Defendants, and each of them, were, and are, the agents, servants, alter egos and/or employees of each of the other Defendants, and all the things alleged to have been done by Defendants were done in the capacity of and as agent, servant, alter ego and/or employee of and for the other Defendants, with their knowledge approval, and ratification.

## JURISDICTION AND VENUE

11. This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, which provides district courts with jurisdiction over civil actions arising under the United States Constitution or laws of the United States.

12. Federal courts have exclusive jurisdiction over copyright claims. 28 U.S.C. § 1338(a). Venue is proper where the defendants are found or where infringing acts occur. 28 U.S.C. §1400(a).

13. This court has personal jurisdiction over Defendants because each Defendant is located within the district or conducts extensive business within the district. In addition, the events giving rise to this lawsuit occurred within this district in that the misappropriation and infringement, as well as production and distribution of the Film, occurred within and from this district.

14. Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the allegations in this complaint occurred in this district and, upon information and belief, both parties have offices and conduct business within this

district.

# GENERAL ALLEGATIONS

15. Plaintiff Martyn Atkins is a professional artist and filmmaker with decades of experience and numerous accolades under his belt. He has created and won awards for art direction, design, photography, commercials and other film projects for dozens of world famous artists and musicians, including the Bee Gees, Depeche Mode, George Harrison, Lenny Kravitz, Johnny Cash, the Eagles, Eric Clapton, and others.

16. Tom Petty and Atkins first met in 1989 while Atkins was art directing an album cover for musician Jeff Lynne, a friend of Petty's. Petty was complimentary of Atkins's work. Later, in 1994, after Petty saw Atkins' recent album artwork he had created for Johnny Cash, Petty contacted Atkins and told him he was looking for a fresh approach for the album art for Petty's new solo album, which would come to be titled *Wildflowers*. Petty and Warner Records ultimately hired Atkins for the job as an independent contractor.

17. Atkins and Petty quickly developed a friendship, and Atkins would go on to attend multiple studio sessions at various studio locations during the making of *Wildflowers*. He also accompanied Petty and others, including band members, producers, engineers, and friends, to other locations or events during that stretch of time. Atkins also joined Petty on the road following release of the *Wildflowers* album in November 1994.

18. As a filmmaker, naturally Atkins brought his camera and some rolls of 16mm film along—and began recording almost immediately. Sensing the importance of the album for Petty, he assured Petty that his footage might be meaningful to Petty someday, even telling Petty "that in 20 years we could make a documentary about *Wildflowers*."

19. Atkins would go on to film not only what was unfolding in the studio, but also many cuts of Petty outside in nature, the band and producers in and out of the

studio, Petty before and after concerts and on the road, and other various assorted content. Over the course of the making of *Wildflowers* and in the months that followed, Atkins would shoot and direct multiple hours of footage (collectively, the "Works").[1]

20. Atkins initially raised the idea that potentially someday Atkins would produce a documentary about Petty and the making of the *Wildflowers* album using Atkins' Works; Petty was enthusiastic about the concept. Over the years, Petty and Atkins would revisit the idea. Petty made it clear to Atkins he wished for Atkins to make the documentary based around the hours of film Atkins had directed and captured during the making of the album and the months that followed.

21. The footage Atkins shot—the Works as defined herein—was not subject to a work-for-hire or other such agreement. Atkins did not license the footage to Petty, Warner Records, any Warner Records affiliate, or anybody else. He was not acting as an employee of Petty or Warner Records, or any other party, during the relevant period relating to the Works. There is no agreement in existence relating to any of the film footage that is the subject of this infringement action.[2] Upon creation, Atkins became author and owner of the Works for purposes of Copyright Law.

22. In or around 1995, as Atkins was moving residences and studios, Petty offered to have Atkins store his 16mm film reels and audio elements in a secure storage facility maintained by Warner Records in Los Angeles for safekeeping. They had become good friends by then; so Atkins took Petty up on his offer and deposited the raw film and audio materials at a facility containing other materials relating to or

---

[1] The film slates that permeate Atkins' footage identify Martyn Atkins as the director. No other party is identified on the slates.

[2] During this time, Atkins entered a separate agreement with Warner Records relating to creation of an Electronic Press Kit ("EPK") for the album. Pursuant to that agreement, Atkins shot Petty during a two-day shoot at a single studio location. Some of the footage in the Film is lifted from the EPK. Atkins is not claiming infringement as to such footage.

belonging to Petty or Warner Records. Atkins maintained access to his materials in the facility at all times.

23. Although Atkins had originally stored the materials at the Warner Records storage facilities, Atkins had occasion to copy much of the footage – though not all of the audio elements – into digital files. In or around 2014, Petty asked to see some of the footage Atkins had captured back during the making of *Wildflowers* and the months on the road following the album's release. Atkins inventoried the raw materials, copied large amounts of the footage and some of the audio onto digital media, and brought selected materials to Petty's home.

24. Petty was thrilled with what he saw, and the two again discussed that Atkins should, when their schedules allowed, produce and direct a documentary about *Wildflowers* and the subsequent tour—primarily featuring Atkins' footage.

25. Tragically, in October 2017, Petty unexpectedly passed away. Atkins would not have the chance to turn his documentary concept into a reality while Petty was still alive.

26. In early 2020, Atkins was asked to attend an in-person meeting with Petty's daughter, Adria Petty, and the Petty estate manager. The meeting took place in Van Nuys, California. Upon information and belief, Ms. Petty and the estate manager were acting as agents for WMG, GOL and/or the Petty estate during the meeting. At the meeting, Atkins was told the estate was considering developing Atkins' idea and creating a documentary about the making of *Wildflowers*. Atkins was asked about his vision, concepts, and ideas for the project, which the parties discussed at length.

27. Atkins was told he would be hired to direct and produce the film project under discussion, but naturally he would ultimately need to identify where all of the original 16mm film footage and audio elements from the mid-1990s were located at the Warner Records storage facility—as such footage would, potentially, be used for the making of the Film. Among the topics of conversation were the details regarding

Atkins' schedule and availability to begin the project and potential sources of financing. Relying on the representations, Atkins disclosed where his raw footage and the audio elements were located at the Warner Records storage facility (which he had previously inventoried), enabling WMG, GOL and/or the Petty estate direct and easy access to the materials.

28.  Atkins left the meeting sincerely believing the next conversation would be to discuss developing the project budget and schedule. It did not cross his mind that anything nefarious was underway. He also expected that before any of his Works would be used (let alone published) for any purpose, he would first be asked for his consent and that a deal would be completed regarding his compensation for licensing any or all of the assets.

29.  However, Atkins was never asked to join any other meetings and never received any formal offer to produce or direct the documentary project discussed during the meeting.

30.  Then, in November 2021, Defendants released a documentary film on YouTube TV and Amazon Prime. The film is titled *Somewhere You Feel Free* (the "Film"). It tells the story of the making of the *Wildflowers* album, eerily consistent with the vision Atkins described during the January 2020 meeting, and features scores of footage and stills of Petty and others during the making of *Wildflowers* and the surrounding time period.

31.  Of the Film's 90 minute run time, **45 minutes are comprised of the Works**—footage that Atkins shot and directed with his camera and his 16mm film.[3] The Works exploited in the Film – of which Atkins is the exclusive owner – include many of the most compelling and iconic shots of Petty depicted, and numerous other artistically directed cuts in and outside of the studio.

---

[3] Plaintiff believes preliminary discovery will reveal which party or parties is responsible for initially misappropriating the Works and delivering the Works to the production team for incorporation into the Film.

32. Atkins simply could not believe it. While prior to the release Atkins caught wind that another director may have been selected for the Film (which, in and of itself, felt like a slap in the face), Atkins was not remotely aware of whether and the extent to which his footage would be used in the documentary that apparently was going to be made. Regardless, to the extent the producers wished to use his film or audio assets, Atkins expected he would be asked first, so that he could either decline or negotiate a license fee or other purchase agreement.

33. But that is not what happened. Rather, Atkins had been conned into believing he would produce and direct the Film so that Atkins would reveal the location of his footage to Defendants and/or those acting on their behalf. He was then cut out completely – in every imaginable respect. He was not even told as a courtesy that his Works would be misappropriated and featured, let alone asked his consent. Defendants not only stole and misappropriated the Works, but also deprived Atkins of the opportunity of creating (and thus becoming "the filmmaker who brought you") the project Atkins largely filmed and which he had always envisioned.

34. That the Film was made using so much of Atkins' footage is not in dispute. After the opening credits, a still shot appears that reads: "In early 2020, a collection of 16mm film was discovered in the Tom Petty Archive. Shot between 1993 and 1995 by Petty's longtime filmographer Marty Atkins while Petty was recording the Wildflowers album and on the tour that followed, most of this material has never been seen before."

35. It is true that Atkins shot much of the footage, but the rest of this statement is a lie. The 16mm film footage was not "discovered." Atkins always knew where it was and even located it for Defendants, believing he would both (i) sign on as director and producer, and (ii) enter a license or other purchase agreement for the footage itself.

36. Yet, compounding this false narrative, during the media circuit for the Film—which, in no small part due to Atkins' direction and filmography, has won

numerous industry awards, including at Sundance and SXSW—the Film's promoters, including Adria Petty and the director Mary Wharton, repeatedly misrepresented to the press that Atkins's footage was magically and unexpectedly discovered in the Warner Records storage facilities.[4]  Upon information and belief, the Film's producers have systematically implemented this false narrative to manipulate the viewing public and bolster the marketing of the Film.

37. Defendants' actions have caused substantial and ongoing harm to Atkins. In addition to Atkins's direct economic damages, which Plaintiff will prove at trial, Atkins was also robbed of the opportunity to produce and direct the documentary he initially conceived, participate in the publicity for such a film, and enjoy the benefits of featuring the project on his resume in the market, of which he is an active participant.

## FIRST CAUSE OF ACTION

## (Primary Copyright Infringement – Against Defendants)

38. Plaintiff incorporates herein by reference the allegations contained in Paragraphs 1 through 37, inclusive, as though set forth in full.

39. The Works are wholly original, and Plaintiff is the exclusive owner of all right, title, and interest, including all rights under copyright, in the Works.

40. Plaintiff holds exclusive copyrights under 17 U.S. Code § 106 to distribute and reproduce the Works, distribute copies of the Works, and display the Works publicly.

41. Plaintiff is the owner of valid and subsisting United States Copyright

---

[4] For example, Wharton has been quoted as stating: "In the summer of 2020, I got a call from an old friend that felt like a lifeline. I had recently left my home in New York City, fleeing the terrifying first wave of the pandemic. It broke my heart to leave the city, but it didn't make sense to stay. It was a strange time, and I really didn't know where I belonged. The phone call came from Adria Petty, who explained that a treasure trove of archival footage of her father, Tom Petty, had been discovered."

Registration Nos. PAu004188721, PAu004188723, PAu004190160, PAu004221264, PAu004221266, and PAu004222366 for the Works, issued by the United States Copyright Office.

42. Pursuant to 17 U.S.C.A. § 501, Defendants have copied the Works without Plaintiff's authorization, consent, or knowledge, and without any remuneration to Plaintiff, and have produced, released, and publicly displayed the Works without Plaintiff's consent, including through commercialized distribution on streaming platforms such as YouTube TV and Amazon Prime.

43. The infringed Works consist of all of the footage displayed by the Documentary that was extracted from Atkins' original film materials previously maintained in storage, and which Atkins identified in January 2020, with the exception of footage that was shot for the specific purpose of the EPK during the two-day EPK shoot (*see supra* n.2).

44. As a result of Defendants' actions, Plaintiff has been damaged in an amount to be proven at trial, and is continuing to be damaged, by the unauthorized reproduction, distribution, public display, and sale of the Film.

## SECOND CAUSE OF ACTION
### (Contributory Copyright Infringement – Against Defendants)

45. Plaintiff incorporates herein by reference the allegations contained in Paragraphs 1 through 44, inclusive, as though set forth in full.

46. Defendants have contributorily infringed on Plaintiff's copyrights by intentionally inducing or encouraging direct infringement of Plaintiff's Works. Through the conduct alleged herein, Defendants knowingly induced, caused, and materially contributed to and participated in the infringement of Plaintiff's Works.

47. Upon information and belief, Defendants' inducement and contribution include, but is not limited to, providing copies of the Works for production of the Film and permitting the marketing and distribution of the Film throughout the United States.

EISNER, LLP

2868894

11
COMPLAINT

48. Defendants had knowledge of the infringing activity, and nonetheless induced and/or materially contributed to the infringing conduct of the direct infringer(s) of Plaintiff's Works.

49. As a result of Defendants' actions, Plaintiff has been damaged in an amount to be proven at trial, and is continuing to be damaged, by the unauthorized reproduction, distribution, public display, and sale of the Film.

## THIRD CAUSE OF ACTION
### (Conversion – Against Defendants)

50. Plaintiff incorporates herein by reference the allegations contained in Paragraphs 1 through 49, inclusive, as though set forth in full.

51. Plaintiff owns and has the right to possess the original physical audio and film materials from which the Works were extracted by Defendants to carry out their infringement ("Personal Property"). Upon information and belief, Defendants substantially interfered with and wrongfully exercised dominion over the Personal Property by knowingly and intentionally misappropriating – including by physically removing the Personal Property from the storage facilities to which Plaintiff previously had access – and retaining the Personal Property without Plaintiff's consent.

52. As a result of Defendants' actions, Plaintiff has been damaged in an amount to be proven at trial and/or is entitled to an order requiring Defendants to turn over the Personal Property to Plaintiff.

## PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1. For actual and compensatory damages in an amount to be proven at trial;

2. That an order be entered compelling Defendants to account for all gains, profits, and advantages derived by each Defendant by its infringement of Plaintiff's copyrights;

3. For disgorgement in an amount to be proven at trial;

4. For restitution in an amount to be proven at trial;

5. For an order compelling the delivery to Plaintiff of the original film and audio materials owned by Plaintiff;

6. For attorneys' fees and costs as permitted by applicable law;

7. For pre-judgment and post-judgment interest at the maximum legal rate; and

8. For such other and further relief as the Court may deem just and proper.

DATED: June 18, 2024                EISNER, LLP

By: _____
ASHLEE N. LIN
BENJAMIN KASSIS
Attorneys for Plaintiff
Martyn Atkins

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues and causes of action triable by a jury.

DATED: June 18, 2024                EISNER, LLP

By: _____
ASHLEE N. LIN
BENJAMIN KASSIS
Attorneys for Plaintiff
Martyn Atkins